# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 06-2726

———————

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of South Dakota. |
| Donovan New, | * | |
| | * | |
| Appellant. | * | |

———————

Submitted: January 8, 2007
Filed: July 18, 2007

———————

Before COLLOTON and GRUENDER, Circuit Judges, and GOLDBERG, Judge.[1]

———————

COLLOTON, Circuit Judge.

A jury convicted Donovan New of two counts of involuntary manslaughter for causing a single-vehicle accident that resulted in the death of his father and cousin. He raises several issues on appeal, and we affirm.

---

[1]The Honorable Richard W. Goldberg, Judge of the United States Court of International Trade, sitting by designation.

I.


On June 17, 2005, New drove with his father and cousin on Highway 18 near the Pine Ridge Indian Reservation in South Dakota. New and his cousin had been drinking heavily that day. At around 4:00 p.m., the driver lost control of the vehicle, which went into a ditch on the opposite side of the road, rolled twice, and landed in a field. The vehicle had been traveling at about 89 miles per hour at the time of the accident, on a road with a speed limit of 65 miles per hour. New and his cousin were thrown from the vehicle, and New's father was trapped in the back seat. Only New survived. At the scene, New claimed that his cousin was the driver.

New was flown to Rapid City Regional Hospital. Hospital staff performed a blood test, which showed a .320 blood alcohol content and the presence of marijuana. Later that day, he was given a variety of medications due to his spinal injuries, difficulty breathing, and pain in his chest and shoulder.

The following afternoon, Special Agent Charles Cresalia of the Federal Bureau of Investigation arrived at the hospital to interview New. New admitted that he had been driving at the time of the crash and had consumed alcohol earlier in the day.

Several weeks after the accident, New went to the Bureau of Indian Affairs ("BIA") building at Pine Ridge to reclaim his belongings left at the scene of the accident. While there, he spoke with BIA Special Agent Fred Bennett. New told Bennett that he had been driving at the time of the accident, although he also said that others were telling him that he was not the driver, and that he was having doubts about his memory of that night. In late July, Bennett arrested New on charges of involuntary manslaughter. In a post-arrest interview, New said he was not sure who was driving.

At trial, the jury heard evidence from various lay witnesses, officers, doctors, and experts in accident reconstruction. New also testified in his own defense that he

could not remember who was driving at the time of the crash. The jury found him guilty on both counts of involuntary manslaughter. At sentencing, the district court[2] applied an adjustment for obstruction of justice under the advisory guidelines based on a finding that New committed perjury during the trial. The court ultimately sentenced New to consecutive terms of 72 months' imprisonment on each count of involuntary manslaughter.

## II.

## A.

New claims that his statements made during the interview in the hospital room should have been suppressed because Agent Cresalia took those statements in violation of the rule of *Miranda v. Arizona*, 384 U.S. 436 (1966). *Miranda* requires that law enforcement agents provide certain prescribed warnings before conducting an interrogation of a suspect who is in custody. *Id.* at 444. New contends that he was in custody during the hospital interview, because he was physically unable to leave, and that Agent Cresalia was thus required to advise him of the *Miranda* warnings before questioning him. We review the district court's decision on this matter *de novo*. *United States v. Axsom*, 289 F.3d 496, 500 (8th Cir. 2002).

The Supreme Court in *Miranda* stated that warnings are required when interrogation is "initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. Since then, the Court has clarified that a suspect is entitled to *Miranda* protection when he is "in custody," and that "the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the

---

[2]The Honorable Karen E. Schreier, Chief Judge, United States District Court for the District of South Dakota.

degree associated with formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (internal quotation omitted). The custody inquiry thus turns on whether, given the totality of the circumstances, a reasonable person would have felt at liberty to terminate the interrogation and leave, *Thompson v. Keohane*, 516 U.S. 99, 112 (1995), or in this case, to terminate the interrogation and cause the agent to leave.

At the time of the interview in question, New was in a private hospital room, confined to his bed in a neck brace and under medication. When Agent Cresalia entered, he identified himself to New, explained he was investigating the fatal accident, and told New that he did not have to talk. Cresalia advised New that he would not be arrested, that he could stop the interview at any time, and that he could ask the agent to leave the room at any time. The district court found that Cresalia used neither force nor deceptive tactics during the interview. New used his call button to summon his nurse twice during the interview, but never sought to terminate the meeting with Cresalia. The final eight minutes of the conversation were tape recorded, and the district court found that New's answers appeared to be very coherent. The district court heard extensive evidence regarding New's medications, and found expressly that New was "not impaired" at the time of the interview, and that even if he was under the influence of narcotic painkillers, "there is no evidence that he was so intoxicated that he did not understand his rights." New was not arrested at the conclusion of the interview.

New's physical condition and immobility require careful analysis of whether *Miranda* should apply, but we conclude, based on the totality of the circumstances, that New was not in custody. In resolving this question, we focus on the restraint imposed by the government agents, *Axsom*, 289 F.3d at 503, because "[t]he sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986); *see also United States v. Erving L.*, 147 F.3d 1240, 1247 (10th Cir. 1998). "[T]he most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the

police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990) (internal quotation omitted). Agent Cresalia made use of this "obvious and effective means" by informing New at the outset that he could terminate the interview at any time, and that he would not be arrested. Cresalia followed through with his assurance by making no arrest at the end of the encounter. The agent himself placed no constraints on New's movement or on his ability to communicate with hospital staff. There is no basis to question the district court's finding that the agent used no force or deceptive tactics, and we do not think the atmosphere in this hospital room, where a nurse was summoned twice to attend to New during the interview, can be fairly described as "police dominated." *See id*. at 1351-52. Given that Cresalia plainly communicated New's freedom to decline the interview and took no other actions to aggravate the environment, we conclude that New was not in custody, and that *Miranda* warnings were not required.[3]

We also conclude that the district court did not clearly err in finding that New's statements to Agent Cresalia were voluntary. A confession is voluntary if it is "the product of an essentially free and unconstrained choice by its maker." *Schneckloth*

_____

[3]New also contends for the first time on appeal that his statements should have been suppressed because the agent's entry into the hospital room without a warrant was an unreasonable search under the Fourth Amendment. This claim was not raised before trial in a motion to suppress, and it is therefore waived. *See United States v. Buchanan*, 985 F.2d 1372, 1380 (8th Cir. 1993); Fed. R. Crim. P. 12(e). Even were the point reviewable for plain error, *see* Fed. R. Crim. P. 52(b); *United States v. Frazier*, 280 F.3d 835, 845 (8th Cir. 2002), we see no "obvious" error, if error at all, given the division of authority on whether a patient has a reasonable expectation of privacy in a hospital room. *Compare*, *e.g.*, *People v. Courts*, 517 N.W.2d 785, 786 (Mich. Ct. App. 1994) ("No one who had ever spent any time in a hospital room could continue to harbor any false expectations about his personal privacy or his ability to keep the world outside from coming through the door") *with State v. Stott*, 794 A.2d 120, 127-28 (N.J. 2002) ("[W]e accept as a basic premise that a hospital room is more akin to one's home than to one's car or office.").

*v. Bustamonte*, 412 U.S. 218, 225 (1973).  New argues that the influence of medications, the "psychological implications" of his circumstances, and his physical helplessness in a strange location combined to render his statements to Cresalia involuntary.  We are not persuaded.

Our cases hold that "[a] confession may not be found involuntary absent some type of coercive activity on the part of law enforcement officials."  *United States v. Kime*, 99 F.3d 870, 880 (8th Cir. 1996).  There was no coercive activity by Agent Cresalia that overbore New's will or impaired his capacity for self-determination. *See Schneckloth*, 412 U.S. at 226.  The district court's finding that New suffered from no mental impairment from medication is supported by expert testimony and not clearly erroneous.  Against that backdrop, Cresalia's simple act of asking questions in a twenty-five minute interview, while emphasizing that New was not under arrest and was free to terminate the meeting, is not the sort of conduct that results in an overborne will attributable to an agent of the government. *See generally United States v. LeBrun*, 363 F.3d 715, 725-27 (8th Cir. 2004) (en banc).

### B.

New also appeals the admission of two prior convictions for driving under the influence of alcohol ("DUI").  Evidence of prior crimes is not admissible to prove a defendant's bad character or propensity to commit bad acts, but it may be admissible for other purposes, including to prove requisite knowledge.  *See* Fed. R. Evid. 404(b).  One element of the charged offense in this case was satisfied by proof that the defendant knew, or could reasonably foresee, that his conduct was a threat to the lives of others.  (R. Doc. 70, Jury Instruction 2).  The government offered the evidence of prior convictions to prove that element.  We review the district court's evidentiary ruling for abuse of discretion.  *United States v. Spears*, 469 F.3d 1166, 1170 (8th Cir. 2006) (en banc).

We agree with the view of several courts, summarized by the Tenth Circuit, that "[a] jury could infer from Defendant's prior drunk driving convictions that he is especially aware of the problems and risks associated with drunk driving." *United States v. Tan*, 254 F.3d 1204, 1210 (10th Cir. 2001); *see United States v. Lorea*, 923 F.2d 725, 729 (9th Cir. 1991); *United States v. Fleming*, 739 F.2d 945, 949 (4th Cir. 1984) ("[T]he driving record was relevant to establish that defendant had grounds to be aware of the risk his drinking and driving while intoxicated presented to others."). New contends that we should take a different view in this case, because there is no evidence that he was actually *driving* a vehicle in the incidents that led to his prior convictions. South Dakota law authorizes a conviction for driving under the influence of alcohol where an intoxicated person either drives or is "in actual physical control" of a vehicle. S.D. Codified Laws § 32-23-1. Thus, the state supreme court upheld a conviction even where a defendant was merely asleep behind the wheel of a stationary vehicle with the keys in one of his pockets. *State v. Kitchens*, 498 N.W.2d 649, 651-652 (S.D. 1993). Our decision in *United States v. McCall*, 439 F.3d 967, 972-973 (8th Cir. 2006) (en banc), held that a felony conviction for DUI qualifies as a "violent felony" under 18 U.S.C. § 924(e) only if there is evidence that the offender was actually *driving* while intoxicated. Because we concluded in *McCall* that an offender convicted of DUI without driving did not "present a serious potential risk of physical injury to another," 439 F.3d at 973, New argues that absent evidence that his prior convictions were premised on actually driving while intoxicated, the convictions are not probative of his knowledge in the instant case.

We are not persuaded that *McCall*'s analysis of § 924(e) dictates the proper interpretation of Federal Rule of Evidence 404(b). The issue in this case was not whether the conduct underlying New's prior convictions presented a serious potential risk of physical injury, but whether the fact that New sustained those convictions tended to make it more probable that he had knowledge of the risks of driving while intoxicated. The prior convictions were relevant, because "[o]ne who drives a vehicle while under the influence after having been convicted of that offense knows *better*

*than most* that his conduct is not only illegal, but entails a substantial risk of harm to himself and others." *Tan*, 254 F.3d at 1210 (emphasis in original) (internal quotation omitted). Whether or not New's prior convictions involved the underlying conduct of driving a vehicle is not dispositive. An offender who has been convicted and punished for operating a parked car while intoxicated would be acutely aware of the seriousness with which society treats drunk driving: The risk of injury to others is so grave that even one who merely gets behind the wheel of a vehicle while intoxicated is subject to criminal sanction. Therefore, the district court did not abuse its discretion in concluding that New's prior DUI convictions were admissible to show knowledge under Rule 404(b).

C.

New next contends that the district court erred by declining to order production of Agent Bennett's case report after he testified. The Jencks Act requires the district court, on the motion of a defendant, to produce any "statements" of a government witness that relate to the subject matter of the witness's testimony, after the witness has testified on direct examination. 18 U.S.C. § 3500(b). The "statements" that must be produced include any written statement made by the witness. *Id.* § 3500(e)(1). We review a district court's ruling under the Jencks Act for clear error. *United States v. Newton*, 259 F.3d 964, 967 (8th Cir. 2001).

In this case, defense counsel discovered through cross examination of Agent Bennett that the agent had prepared a case report that the government had not produced. In a bench conference, the prosecutor declared that she had turned over all information Bennett had gathered in the course of his investigation, but that she had not turned over his report describing details of the case, because it contained no impeachment or exculpatory material. The court asked the prosecutor if she had reviewed this report for material discoverable under *Brady v. Maryland*, 373 U.S. 83 (1963). When the prosecutor affirmed that she had, the court declared, "Case report

-8-

is not covered under discovery rules. It's summaries of interviews, any *Brady* material, any Jencks material. I'm going to deny the request."

There is no requirement in the Jencks Act that a statement meet a threshold for impeachment value or include exculpatory evidence before it is discoverable. As long as it is a "statement" that "relates to the subject matter as to which the witness has testified," 18 U.S.C. § 3500(b), then it should be ordered produced. The report at issue is a five-page typewritten document, headed "Details of Case," that sets forth actions that Bennett took on the date of the accident and observations that he made at the scene of the accident. The agent's report describing what he saw and did at the crime scene is related to his testimony on direct examination about the crime, and we see no basis to conclude that it is not a "statement" discoverable under the Jencks Act.

Having determined that there was noncompliance with the Jencks Act, we must consider whether the error requires reversal of New's conviction. Where, as here, there is no indication of bad faith on the part of the government, we will not reverse unless there is a showing of prejudice to the defendant. *United States v. Douglas*, 964 F.2d 738, 741 (8th Cir. 1992); *United States v. Roberts*, 848 F.2d 906, 908 (8th Cir. 1988).

New gave only one example of potential prejudice in his brief on appeal. He contends that Bennett's report mentioned that one of New's shoes was found stuck on the vehicle's center console, which was dislodged from its original location. New claims he could have used this information to show a discrepancy between what Bennett remembers from the scene and the testimony of another officer regarding the scene. Even without the report, however, New was able to adduce the relevant evidence from Bennett. On direct examination, Bennett testified that he had seen New's shoe at the center console of the vehicle. On cross examination, he testified that the console was "ajar." In short, Bennett's testimony on the witness stand was entirely consistent with his written report on these points. There is no reason to

believe that New was prejudiced by his inability to review Bennett's prior consistent statement.

At oral argument, New's counsel argued that Bennett's report would have helped his cross examination of Agent Cresalia. New claims that his confession to Cresalia was influenced by detailed information that Cresalia gave him about the crash, which convinced New that he must have been the driver. Cresalia's testimony was inconsistent with New's assertion that Cresalia provided detailed information, because Cresalia said he only knew the barest information about the accident from two phone conversations he had with Bennett. Bennett's courtroom testimony agreed with Cresalia's.

This theory is an unlikely basis for showing prejudice under the Jencks Act, for the purpose of the disclosure requirement is to assist the defense in cross-examining the witness who made the statement, not with questioning some other witness (in this case, a witness who already had testified before Bennett even appeared). *See Jencks v. United States*, 353 U.S. 657, 666-67 (1957). Even so, Bennett's report is not inconsistent with Cresalia's testimony. Bennett recorded that in the first telephone conversation, he gave Cresalia the names of the victims and briefed him on the investigation. Bennett had not yet been to the scene, so this briefing could not have included the details that New claims Cresalia divulged to him. As to their second conversation after Bennett arrived at the scene, Bennett noted in his report only that he had paged Cresalia, and that Cresalia "returned the message immediately and briefed [*sic*] on the investigation." Bennett wrote that he asked Cresalia to do a blood draw and check New's condition. The report does not state that Bennett provided Cresalia with details about the accident and the scene of the crash. Accordingly, we conclude that New was not prejudiced by the government's failure to disclose Bennett's report in accordance with the Jencks Act.

D.

New also alleges two instances of prosecutorial misconduct – improper questioning of a government witness and improper comments in closing argument. To obtain a reversal based on prosecutorial misconduct to which there was proper objection, a defendant must show that (1) the prosecutor's remarks or conduct were improper, and (2) the remarks or conduct affected the defendant's substantial rights so as to deprive him of a fair trial. *United States v. Mullins*, 446 F.3d 750, 757 (8th Cir.), *cert. denied*, 127 S. Ct. 284 (2006). If the remarks were improper, then we determine whether they deprived the defendant of a fair trial by examining the cumulative effect of the misconduct, the strength of the properly admitted evidence of the defendant's guilt, and any curative actions taken by the trial judge. *Id.* The ultimate question is "whether the prosecutor's comments, if improper, so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation and citations omitted).

The first instance of alleged misconduct involved the prosecutor's cross examination of John Mousseau, a police officer who was at the scene of the accident and spoke briefly with New before he was taken to the hospital. When Mousseau asked who had been driving, New paused for thirty to forty-five seconds and then said his cousin drove. In her cross examination, the prosecutor sought to have the officer testify as to whether he thought New's statement was truthful. Defense counsel objected to the question as asking for an "improper lay opinion," and the judge sustained the objection. Then, the prosecutor asked a series of questions designed to lay a foundation for the officer giving an expert opinion as to the statement's veracity, but when she again asked for his opinion, the defense objected and the court sustained it. New argues that this questioning improperly suggested that New was lying.

We are troubled that the prosecutor sought to elicit an opinion about New's credibility from a law enforcement agent who interviewed him. New's credibility was

-11-

plainly a question for the jury, and it was not a proper subject of lay or expert opinion testimony. *Engesser v. Dooley*, 457 F.3d 731, 736 (8th Cir. 2006). The district court, however, properly sustained New's objections to the questions seeking to elicit an opinion on credibility, and New did not request a mistrial. The court further instructed the jury that questions are not evidence. (R. Doc. 69, Jury Instruction 6). Even without the prosecutor's improper questions, New's lengthy pause in response to Mousseau's question was part of the record and laid the foundation for legitimate argument about New's credibility. We are confident that the prosecutor's questions, standing alone, did not deprive New of a fair trial.

The second allegation of misconduct relates to the prosecutor's closing argument. New made no contemporaneous objection, so we review the claim of misconduct under the plain error standard. *United States v. Ehrmann*, 421 F.3d 774, 783 (8th Cir. 2005), *cert. denied*, 126 S. Ct. 1099 (2006). If New shows an obvious error that affected his substantial rights, then we may correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732 (1993).

Near the beginning of her closing argument, the prosecutor stated, "[T]here's no more desperate person sitting in this courtroom today than Donovan New. Why, you ask? Because he's a convicted felon; he's going back to prison and he knows it." New argues that this statement sought improperly to appeal to the passions and prejudices of the jury, and that it affected the fairness, integrity, and public reputation of the proceeding.

We are not persuaded that this comment was obviously improper. New testified at trial, and his credibility was at issue. That he was a convicted felon is relevant to his credibility, *see* Fed. R. Evid. 609(a)(1), and it was not improper to suggest that his desire to avoid punishment gave him a motive that is relevant to judging his credibility. The characterization of New as "desperate" and the reference to "going

-12-

back to prison" may have pressed the bounds of fair argument, but it must be remembered that as long as the argument was supported by reasonable inferences from the evidence, a prosecutor is not forbidden to use "colorful and forceful language" in her argument to the jury. *Mullins*, 446 F.3d at 759. "If an arguably improper statement made during closing argument is not objected to by defense counsel, we will reverse only under exceptional circumstances." *Id.* (internal quotation omitted). We do not think these disputed comments, even assuming they were improper, so infected the trial with unfairness that relief is warranted.

E.

New also challenges the sentence imposed. He first contends that the district court erroneously calculated his advisory guideline range by adjusting his offense level based on obstruction of justice under USSG § 3C1.1. The government argued that New should receive a two-level adjustment for committing perjury at trial. The district court, after hearing argument on the matter, found as follows: "Having reviewed his testimony, a transcript of his testimony, having listened to it at trial, I find that he did attempt to suborn perjury, so I find the two-level enhancement applies." (S. Tr. at 8). There was no argument that New attempted to suborn perjury by another, so we presume the district court misspoke and intended to express a finding that New committed perjury. This meaning is evident from the court's subsequent statement that "I think the statement during trial was not truthful," and the court's ultimate conclusion that New committed "perjury." (*Id*. at 9).

Pursuant to USSG § 3C1.1, a defendant is subject to an adjustment for obstruction of justice if he willfully testifies falsely under oath regarding any material matter. The court may not apply the upward adjustment simply because a defendant testifies on his own behalf and the jury disbelieves him. Rather, the court must conduct an independent evaluation and determine whether the defendant committed perjury. *United States v. Dunnigan*, 507 U.S. 87, 95 (1993). We review a trial court's

factual findings for clear error and its construction of the advisory guidelines *de novo*. *United States v. Garcia-Gonon*, 433 F.3d 587, 591-92 (8th Cir. 2006).

The district court compared New's courtroom testimony that he could not remember anything about the night of the accident with the detailed statement that New gave to Agent Cresalia in the hospital. The court recounted New's statement to Cresalia, in which New claimed that he swerved to avoid a pedestrian, and remarked that "[t]his is not somebody that was fussy with the facts about what happened or couldn't quite remember what happened." (S. Tr. at 8). The court found that New "had a very detailed memory of what he told Agent Cresalia," but "after he heard what his possible defense was[,] that's what his testimony became, and that's perjury." (*Id.* at 9). We conclude that the district court's statement was a specific finding of perjury and was adequately supported by the record.

New also contends that the 144-month sentence imposed by the district court was unreasonable with regard to 18 U.S.C. § 3553(a). He contends that a survey of federal involuntary manslaughter cases reported in a commercial database show that New's sentence is the longest federal sentence in the country for vehicular homicide in the last ten years. For that reason, he says, the district court's sentence fails to consider "the need to avoid unwarranted sentence disparities among defendant with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). New raised no objection to the sentence on this or any other ground at the sentencing hearing. (S. Tr. at 2, 16, 20).

The advisory guideline range for New was 120-144 months' imprisonment, with the high end of the range equal to the statutory maximum penalty. The court explained that "[w]hen I look at your past and I look at the factors in § 3553(a), all of them point to you getting a sentence at the highest level that I could do." (S. Tr. at 15). The court recounted New's lengthy and violent criminal record – which included twenty-three criminal history points under the sentencing guidelines and thirteen more

-14-

crimes for which no points were scored – and noted that the instant offense occurred barely a month after New was released from prison. (S. Tr. at 15-16). The court observed that New had committed domestic violence against his wife, and that when he was given an opportunity to learn skills and gain an education, he committed arson at the job corps facility. The court found that "[t]o protect society, in particular," the maximum sentence of 144 months was appropriate. (S. Tr. at 16).

The sentence imposed was within the advisory guideline range, and we accord it a presumption of reasonableness. *See Rita v. United States*, No. 06-5754, 2007 WL 1772146, at \*6 (U.S. June 21, 2007); *United States v. Lincoln*, 413 F.3d 716, 717 (8th Cir. 2005). Where the district court's judgment conforms to the work of the Sentencing Commission, it is likely that the resulting sentence is reasonable. *Rita*, 2007 WL 1772146, at \*6. New's survey of other involuntary manslaughter cases does not convince us otherwise. If other offenders received lesser terms of imprisonment based on more favorable advisory guideline ranges, then the differences in sentence are likely explained by differences in offense conduct or criminal histories, which are accounted for in the advisory guidelines. New's submission does not persuade us that the district court's sentence will result in unreasonable sentence disparities among similarly-situated defendants.

\*      \*      \*

For the foregoing reasons, the judgment of the district court is affirmed.

_____