# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-2363

_____

United States of America

*Plaintiff - Appellee*

v.

Nathaniel Patrick Azure

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of North Dakota - Eastern

_____

Submitted: October 20, 2025
Filed: January 15, 2026
[Published]

_____

Before SMITH, KELLY, and GRASZ, Circuit Judges.

_____

PER CURIAM.

Nathaniel Patrick Azure was convicted of six firearms-related crimes within the Spirit Lake Reservation. On appeal, he challenges the district court's[1] denial of

_____

[1]The Honorable Peter D. Welte, Chief Judge, United States District Court for the District of North Dakota.

his motion for mistrial based on prosecutorial misconduct and its admission of Facebook records. We affirm.

## I. *Background*

Azure was charged with three counts of assault with a dangerous weapon, in violation of 18 U.S.C. §§ 113(a)(3) and 1153, and three counts of discharging or brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). The counts concerned Azure shooting Dexter Greywind on January 6, 2021; pulling a gun on Lance Cavanaugh (Lance) on May 21, 2022; and shooting Daniel Cavanaugh (Daniel) on May 22, 2022, on the Spirit Lake Reservation.

Prior to trial, the government notified Azure of its intent to introduce his certified Facebook records. Those records related to the May 22 shooting. Azure objected, arguing that the certification lacked information enabling him "to verify the veracity of Hiralys Alvarez's [the alleged Meta Custodian of Records] identity, employment, or role (if any) at Meta." R. Doc. 138, at 5.

At the final pretrial conference, Azure asserted that the Facebook certification was "insufficient to establish authenticity." R. Doc. 236, at 26. Azure acknowledged that "there's a declaration of certification" but argued that "there is no way to contact HOR-al-is (phonetic) Alvarez at Meta to determine if there is, in fact, even a HOR-al-is (phonetic) Alvarez that exists. And, in fact, getting through to Meta is nearly impossible to try to do that." *Id.* at 27. The government responded that, in addition to the certification, it would offer "additional information linking [Azure] to the record." *Id.* at 28. Specifically, witnesses would "testify that they reached out to [Azure] via this Facebook account." *Id.* The district court overruled Azure's objection. The court reasoned that the Facebook records "are self-authenticating and witness testimony is not required for their authentication but there may be a need to tie it up with other evidence." *Id.* at 29. The court noted that Azure was not precluded from raising the objection again during trial.

Azure then supplemented his authentication objection by observing that "the rule requires that the defendant have a fair opportunity to confront these certifications. And when we get a declaration that . . . contains no effective means to contact the person that is declaring and certifying these records, there is no fair opportunity to confront the certification." *Id.* at 30. In response, the government represented that it "could certainly try to find contact information for this individual" but noted that "[t]he agent will testify that he reached out to Meta and received this certification through her. He doesn't get to choose who certifies it. . . . [I]t's all done through a portal. It gets assigned a number and that's how it's done, Your Honor." *Id.* The court decided to "forge ahead," explaining that "the state of the law is clear with regards to the Eighth Circuit and the Facebook records." *Id.* The court maintained its ruling.

At trial, the government questioned FBI Special Agent Daniel Genck about the Facebook records. Agent Genck confirmed that he had "gone to Facebook for records a number of times throughout [his] career." R. Doc. 226, at 49. Agent Genck explained that he used "the Facebook law enforcement portal," which is "a website that Facebook runs that allows law enforcement to make legal requests to Facebook directly." *Id.* at 50. Agent Genck testified that when making a preservation request to Facebook, he provides Facebook with a "unique number" associated with a Facebook account. *Id.* at 51. Facebook then freezes the account. This "freeze," Agent Genck confirmed, "is like a snapshot in time of what the account looks like in that moment." *Id.* at 51–52. Facebook sent Agent Genck an "acknowledgment that [it] received [his] preservation request" for the "account that [he] believed [belonged to] Nathaniel Azure." *Id.* at 52–53.

According to Agent Genck, he subsequently sought "records pursuant to a federal court order . . . related to that particular account" with the "unique identifier." *Id.* at 53. Once again, Agent Genck used the law enforcement portal to advise Facebook that he had a court order requiring it to comply. Pursuant to the court order, Agent Genck sought information for a three-day period of time and requested the subscriber names; user names; screen names; mailing addresses; residential

addresses; business addresses; email addresses; records of session times and durations; "the temporarily assigned network addresses such as internet protocol or IP addresses associated with those sessions"; the registration IP address; and the "records of user activity for each connection made to or from the account[,] including log files, messaging logs, the date/time, length and methods of connections, data transfer volume, user names[,] and source and destination IP addresses." *Id.* at 55.

Agent Genck confirmed that Facebook provided him with "responsive business records." *Id.* at 56. Along with "11 pages of records," Facebook "also provide[d] [Agent Genck] with a Certificate of Authenticity saying that these are, in fact, a copy of the business records that [Facebook] ha[s] that relate to this time period that this Court Order states and these subjects of information that this Court Order states [Facebook] ha[s] to provide." *Id.* at 57. Agent Genck confirmed that "Government's Exhibit 47" was the "records that [Facebook] sent to [Agent Genck]." *Id.* The government then offered Exhibit 47 into evidence, but Azure renewed his objection based on the "foundational problem." *Id.* at 58. The court overruled the objection and received Exhibit 47 into evidence, explaining that the government established foundation "through testimony, through certification[,] and through the testimony at trial." *Id.*

During trial, the government also questioned Agent Genck about law enforcement's investigation and collection of physical evidence. During this line of questioning, the government asked Agent Genck whether Azure consented to a buccal swab for DNA testing purposes:

> Q.     Nevertheless did you at one point try to obtain a buccal swab by consent from the defendant?
>
> A.     I did.
>
> Q.     And when did that happen?

A. When he was arrested. As part of the booking process with the U.S. Marshals Service, there's a mandatory DNA sample that's taken from every arrestee. As part of that I also asked him separate and aside from this: Would you consent to DNA so that we could search the evidence in this case? And he declined.

Q. A mandatory part can't be submitted for testing because it's mandatory?

A. Correct.

Q. But you asked him for a supplementary one that you could submit for testing if he consented?

A. Yes.

Q. And he did not?

A. Correct.

Q. And what is a buccal swab?

A. It's a mouth swab, usually a cotton swab of both sides of the cheek. We usually do two samples each and submit those.

R. Doc. 225, at 289–90. After this inquiry, the district court ended witness testimony for the day. Azure's counsel never objected during this line of inquiry.

Before proceedings commenced the next morning, however, Azure filed a motion for mistrial or curative instruction based on prosecutorial misconduct for asking Agent Genck whether Azure consented to the buccal swab. The government opposed the motion. The court recessed so that it could review Azure's written motion. Following the recess, the court afforded each party an opportunity to briefly argue their positions on the motion. Azure's counsel specified that Azure's challenge was to "the evidence that was not consented to or any testimony regarding not having consent with that," as well as Agent Genck's testimony "on Mr. Azure's right to remain silent and not give an explanation for certain activities that he may or may

-5-

not have been a part of." R. Doc. 226, at 13. Azure's counsel asserted that mistrial was the appropriate remedy or, in the alternative, a curative jury instruction. Azure's counsel requested a curative instruction be given then and at the trial's conclusion.

The court denied the motion for mistrial but granted the motion for a curative jury instruction. First, it found that the government did not intend to "deliberately provoke a mistrial." *Id.* at 19 (citing *Oregon v. Kennedy*, 456 U.S. 667, 675–76 (1982) ("Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause.")). The court determined that the government "took great pains to elicit testimony regarding the integrity and the fidelity of the investigation itself." *Id.* It found "that the line of questioning was not improper." *Id.* at 20. The court also noted that Azure never objected to Agent Genck's testimony. Second, the court assumed that even if the prosecutor's line of questioning was improper, it would nonetheless deny the motion for mistrial based on "the cumulative effect of the alleged misconduct, . . . the strength of properly admitted evidence in this case[,] and . . . [the] curative actions that are options of the [c]ourt." *Id.* at 21. Finally, "[i]n an abundance of caution," *id.*, the court issued the following curative instruction to the jury when testimony resumed:

> Ladies and gentlemen, you heard testimony that the Defendant would not consent to the taking of his DNA. The United States Constitution guarantees its citizens the right to be free from unreasonable searches. Without a warrant, citizens are free to refuse to consent to the government's request to search their persons. A person may refuse to consent to the taking of DNA, and you may not consider whether the Defendant's refusal to consent to the taking of his DNA as evidence of guilt.

*Id.* at 25–26. Neither party objected to the court's curative instruction. The court repeated the instruction in its final instructions to the jury. *See* R. Doc. 169, at 29.

The jury convicted Azure, and the district court sentenced him to 384 months' imprisonment.

## II. *Discussion*

On appeal, Azure challenges the district court's denial of his motion for mistrial based on prosecutorial misconduct and its admission of the Facebook business records.

### A. *Prosecutorial Misconduct*

"We review for an abuse of discretion the district court's denial of a defendant's motion for mistrial on the basis of prosecutorial misconduct." *United States v. Kopecky*, 891 F.3d 340, 343 (8th Cir. 2018). "The test for reversible prosecutorial misconduct has two parts: (1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." *United States v. Hernandez*, 779 F.2d 456, 458 (8th Cir. 1985). We evaluate three factors in determining whether the defendant was deprived of a fair trial. *Kopecky*, 891 F.3d at 343. First, we consider "the cumulative effect of the misconduct." *Id.* Second, we consider "[t]he strength of the properly admitted evidence." *Id.* Finally, we consider any of the district court's "curative actions." *Id.* "The ultimate question is whether the prosecutor's comments, if improper, so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (quoting *United States v. New*, 491 F.3d 369, 377 (8th Cir. 2007)).

"Here, even assuming the prosecutor's line of questioning was improper, the district court did not abuse its discretion in denying [Azure's] motion for mistrial because the exchange did not prejudicially affect his right to a fair trial." *Id.* (footnote omitted). First, the exchange between the government and Agent Genck concerning whether Azure consented to the buccal swab was "brief" with "little potential for prejudicial effect in light of the whole trial." *Id.* The brief exchange consisted of the government asking, "But you asked him for a supplementary [buccal swab] that you could submit for testing if he consented?" R. Doc. 225, at 290. Agent Genck

-7-

responded, "Yes." *Id.* The government then asked, "And he did not?" *Id.* Agent Genck answered, "Correct." *Id.*; *see also Kopecky*, 891 F.3d at 343 ("The testimony in question constituted a single, short, isolated exchange in the context of a several-day trial: 'Did you get consent?' 'I did not.'").

"Second, the [g]overnment presented strong, independent evidence of [Azure's] guilt." *Kopecky*, 891 F.3d at 343. "The key participants who were with Azure at the time of his crimes testified." Appellee's Br. 31.[2] The government also presented documentary,[3] physical,[4] and forensic[5] evidence to establish Azure's guilt. Appellee's Br. 33–35.

---

[2]These witnesses included Michael Denne, his brother, and Peyton Walkingeagle, who testified about the January 6 shooting of Greywind; codefendant Dantae Whitetail, who testified about the May 21 incident with Lance; and D'Angelo Littlewind, Azure's cousin, who testified about being with Azure just prior to the shooting of Daniel. Additionally, Greywind, Lance, and Daniel—the victims of the crimes—all testified. And Blossom Harrison, Taylah Thumb, Larissa Dunn, and Brittany Lawrence, bystanders to the various crimes, testified about what they saw and heard on the dates in question. In addition to these witnesses, four Bureau of Indian Affairs (BIA) officers and two FBI agents testified about the results of their investigation.

[3]Gov't Ex. 4 (map identifying location of the shotgun in January 2021); Gov't Exs. 11–18 (photographs of injuries sustained by Greywind and Daniel); Gov't Ex. 66 (photographs of May 22 crime scene); Gov't Exs. 49–52 (maps of the places where events took place); Gov't Exs. 53–55 (surveillance videos); Gov't Exs. 5, 70 (photograph of Azure taken in May 2022 and photograph of another "Nathaniel" whom Azure tried to implicate); Gov't Exs. 61–65 (video calls between Azure and others while he was in jail after the May 22 shooting).

[4]Gov't Exs. 1, 2 (two firearms that were used in the commission of the crimes); Gov't Ex. 3 (shell casing found at the scene).

[5]Gov't Ex. 35 (lab report dated January 24, 2023, of firearm); Gov't Ex. 37 (visual aid prepared by firearms and toolmarks expert).

Finally, the district court issued an unobjected-to curative instruction once Azure raised the issue of prosecutorial misconduct the day following Agent Genck's testimony about the buccal swab. "We presume that juries follow a court's instructions, and we are satisfied that the court's curative actions here dispelled any potential for undue prejudice stemming from the improper remarks." *Kopecky*, 891 F.3d at 344 (citation modified).

"On the basis of these three considerations, we find that the brief exchange between the prosecutor and [Agent Genck] was not so prejudicial as to deprive [Azure] of a fair trial." *Id.*

## B. *Facebook Records*

Azure claims that the certifications provided by the government failed to include any contact information for the individual certifying the Facebook records and therefore should not have been admitted.

"We review the district court's admission of evidence for abuse of discretion. We give great deference to the ruling of the trial court." *United States v. Lamm*, 5 F.4th 942, 946 (8th Cir. 2021) (citation modified). Reversal is only appropriate "when an improper evidentiary ruling affected the defendant's substantial rights or had more than a slight influence on the verdict." *United States v. Perez*, 61 F.4th 623, 626 (8th Cir. 2023) (quoting *United States v. Omar*, 786 F.3d 1104, 1112 (8th Cir. 2015)).

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). "Testimony that an item is what it is claimed to be" "satisfies the requirement." Fed. R. Evid. 901(b)(1). "[E]vidence that satisfies the requirement" also includes "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed. R. Evid. 901(b)(4). "The party authenticating the exhibit need only prove a rational basis for that party's claim

that the document is what it is asserted to be. Authentication may be established by circumstantial evidence." *Lamm*, 5 F.4th at 946–47 (citation modified). "To authenticate evidence, a party must clear only a low bar." *Id.* at 947 (citation modified). "Conclusive proof of authenticity is not required, and once the threshold requirement is met, any question as to whether the evidence is authentic is for the jury." *Perez*, 61 F.4th at 626 (citation modified).

"As we have recognized, the 'authentication of social media evidence presents some special challenges because of the great ease with which a social media account may be falsified or a legitimate account may be accessed by an imposter.'" *United States v. Midder*, 139 F.4th 649, 652 (8th Cir. 2025) (quoting *Perez*, 61 F.4th at 626). "[A] certification from a social media platform alone is insufficient to establish authenticity." *Perez*, 61 F.4th at 626. But "the [g]overnment may authenticate social media evidence with circumstantial evidence linking the defendant to the social media account." *Lamm*, 5 F.4th at 948.

We conclude that the government's evidence provided a rational basis for its claim that the Facebook records were for Azure's account, which he used around the time of the May 22 shooting of Daniel. First, BIA Special Agent Jerry Lenoir testified that Lance showed him a particular Facebook profile, which he then captured by screenshot. The screenshot was admitted into evidence as Government's Exhibit 19. Agent Lenoir confirmed that "the first page of Exhibit 19 reflects the profile name of a Facebook account" and that "the second page reflects the unique Facebook identifier," which law enforcement used "to preserve [the] account." R. Doc. 223, at 16–17.

Second, Lance testified that after Daniel's shooting, he messaged Azure on the Facebook profile identified in Exhibit 19. According to Lance, he recognized some of Azure's "friends" on the profile. R. Doc. 225, at 51. One of those "friends" was D'Angelo Littlewind, whom Lance described as Azure's "little cousin," *id.* at

28, and "little brother," *id.* at 51.[6] Lance confirmed that "the user of the Nathaniel Azure account read the messages," but Azure never responded. R. Doc. 225, at 53.

Third, the minor sister of Azure's then-girlfriend testified about seeing Facebook messages that Azure sent to her sister, Skyla Cavanaugh, asking her to pick him up on May 22, 2022. According to the minor sister, she was using Skyla's phone while Skyla was taking a nap. She noticed that the phone was receiving Facebook "messages and calls" from Azure. R. Doc. 224, at 47. The minor sister testified that in the Facebook messages, Azure asked Skyla "if she could go get him." *Id.* The minor sister knew that the Facebook messages were from Azure because "[h]is name popped up." *Id.* Azure also placed "audio calls that [were] received through Facebook" to Skyla's phone. *Id.* at 48. Once again, the minor sister knew the calls were from Azure because "[h]is name popped up." *Id.*

Fourth, Agent Genck testified that Facebook is "the most common . . . communication method used on the Spirit Lake Reservation" because of its lack of cost, compatibility with Wi-Fi, and ease of use across mobile devices. R. Doc. 226, at 47–48. Through Facebook's law enforcement portal, Agent Genck had Facebook preserve records. In response to legal process, Facebook provided records through the portal to Agent Genck, with a certificate of authenticity (Exhibit 47).

Fifth, once Exhibit 47 was admitted into evidence, Agent Genck testified that "whomever set up the [Facebook] account" used "the first name . . . Nathaniel [and] the last name Azure." *Id.* at 58–59. When Agent Genck saw this information, he recalled Lance's statement that "he [had] messaged Nathaniel Azure's Facebook account" and provided law enforcement with "this number." *Id.* at 59. Agent Genck noted that "whoever set up the [Facebook] account used the name Nathaniel Azure. So it follow[ed] . . . that this might be the correct account." *Id.* Agent Genck confirmed that he "had seen the . . . landing page for that Facebook account even before [he] sought [the Facebook records] and saw that picture of D'Angelo

---

[6] Littlewind testified that he and Azure are cousins. R. Doc. 224, at 204.

Littlewind as one of the friends." *Id.* This gave "further credence" that this was Azure's account. *Id.* Exhibit 47 also contained an IP address used to access the account. Agent Genck confirmed that he was "really focused . . . on figuring out where . . . th[e] IP address was located that was used to access this Facebook account after the shooting." *Id.* at 69. The IP address pointed to Ross Acres, a neighborhood near the neighborhood in St. Michael where the May 22 shooting occurred. The subscriber records showed that one of Azure's relatives lived at the address in Ross Acres where that IP address was assigned. The back of the relative's property "butt[ed] up to the property of . . . Nathaniel's aunt." *Id.* at 82. Agent Genck testified that the Facebook account access location was important because he was "looking into [Azure's] supposed alibi." *Id.* at 69. Law enforcement never obtained the "content" of any Facebook messages; instead, Agent Genck testified that only "subscriber and account information" were provided. *Id.*

"Taken together, this evidence provided a rational basis for the district court to pass the question of authentication [of the Facebook records] to the jury." *Lamm*, 5 F.4th at 948. The district court did not abuse its discretion in admitting the Facebook records.[7]

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____

_____

[7]Azure argues that he did not have "a fair opportunity to challenge the purported certificate," but he does not explain why the information provided was not sufficient to allow him to "verify the veracity" of the custodian's "identity, employment, or role (if any) at Meta." Appellant's Br. 17. Even assuming that the district court erred in not affording Azure the opportunity to challenge the certificate, such error was harmless. *See* Fed. R. Crim. P. 52(a) ("Any error . . . that does not affect substantial rights must be disregarded."). As explained, the government presented sufficient circumstantial evidence linking Azure to the Facebook account, and Azure does not offer any suggestion as to how "verifying the veracity" of the custodian's name, employment, and role at Meta might have called into question that evidence.