# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1930

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Arkansas. |
| Barry J. Jewell, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: March 11, 2010
Filed: July 30, 2010

_____

Before BYE, COLLOTON, and GRUENDER, Circuit Judges.

_____

BYE, Circuit Judge.

A jury convicted Barry Jewell of aiding and abetting tax evasion in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2. The district court[1] sentenced him to thirty months in prison and three years of supervised release, and imposed a $25,000 fine. Jewell appeals his conviction on a number of grounds. We affirm.

_____

[1]The Honorable J. Leon Holmes, Chief Judge, United States District Court for the Eastern District of Arkansas.

# I

Jewell practiced tax law in Little Rock, Arkansas. Carl and Patricia Evans were two of his clients. In 2000, Carl Evans and his corporation, Press Promotions, settled a copyright infringement case for $3,000,000. Carl Evans personally received $2,062,500 of the settlement and Press Promotions received $937,500. After receiving the settlement offer but prior to accepting it, Carl Evans consulted Jewell about the tax consequences of the settlement.

In order to reduce the couple's 2000 year tax liability, Jewell suggested a scheme whereby Carl Evans purportedly arranged for a venture capital group – prior to the settlement – to fund the copyright infringement suit in exchange for $250,000. Evans would receive $250,000 even if he lost the suit, but if the suit was successful the venture capital group would receive any amount above $250,000 in exchange for funding the litigation and bearing the risk of an unsuccessful outcome. Jewell suggested the transaction so that the Evanses would only have to report $250,000 in income from the settlement on their 2000 tax return instead of the full amount actually received. In truth, however, Carl Evans funded the lawsuit himself and the agreement with the venture capital group never occurred.

To carry out the scheme, Jewell wrote a letter to Carl Evans describing the fictitious agreement with the venture capitalists. Evans then gave a copy of the letter to his accountant, who relied upon it when preparing the couple's 2000 tax return. To hide the additional settlement money, Jewell created a corporation called MIN Enterprises, Inc., and placed the money in a retirement account for MIN Enterprises. Jewell forged and backdated documents to carry out the scheme. For example, Jewell made it appear as if MIN had been created in February 1998, before the $3 million settlement, even though MIN was actually created after the settlement in July 2000. One document, backdated to February 1998, contained an Employer Identification Number the Internal Revenue Service (IRS) did not issue until July 2000. The money

placed in the MIN retirement account was eventually transferred back to Carl Evans in May 2002. As payment for his services, Jewell asked for an amount equal to exactly 10% of the estimated "tax savings" which would result from the scheme, or $102,565. Carl Evans negotiated a reduced fee of $62,000 and paid Jewell that amount for his services.

On April 4, 2007, a federal grand jury returned an indictment charging Jewell with aiding and abetting tax evasion in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2, for causing the filing of a false return for the tax year 2000 in the name of Carl and Patricia Evans. The indictment also charged one count of conspiracy to commit mail fraud and three counts of money laundering. These four additional counts arose from the government's allegation that Jewell and his law partner, Bobby Keith Moser, conspired from 1996 through August 2002 to use client trust funds to pay for the general operating expenses of their law firm and Jewell's child support, and to invest over $1 million in a technology firm called Scanning Technologies, Inc., without the knowledge or approval of their clients.[2] The alleged mail fraud arose from Jewell and Moser using the mails to solicit new and existing clients in order to keep client trust accounts funded. The money laundering counts alleged Jewell engaged in monetary transactions with property derived from client trust accounts. The government dismissed the three money laundering charges during trial; the jury decided the mail fraud conspiracy and tax evasion charges.

Carl Evans testified at trial, giving an account of the advice Jewell gave him with respect to the fictitious venture capital agreement. The government also introduced evidence regarding the forged and backdated documents Jewell created to

[2]Moser pleaded guilty to the mail fraud conspiracy, as well as to money laundering charges originally brought against him in Michigan, and received a sentence of 188 months in prison. Moser's case gained some notoriety when he fled the country prior to his first scheduled plea hearing and was later captured in Madagascar.

carry out the scheme. In addition, the government called an IRS agent who explained the difference between the taxes the Evanses actually paid and the amount they should have paid resulted in a tax deficiency of $737,436 in the 2000 tax year.

The jury acquitted Jewell on the mail fraud conspiracy charge, but convicted him of aiding and abetting tax evasion. This timely appeal followed in which Jewell raises a number of issues challenging his conviction. Additional facts relevant to the disposition of the issues Jewell raises on appeal will be discussed below.

II

A

First, Jewell claims the district court erred in admitting into evidence a video deposition Jewell gave in a lawsuit between Piedmont Technologies and Scanning Technologies, the company in which the government alleged Jewell invested using funds from clients' trust accounts. At trial, Jewell objected to the introduction of the videotape as unfairly prejudicial under Rule 403 of the Federal Rules of Evidence. "We give deference to a district court's decision under the Rule 403 balancing test and reverse only for a clear abuse of discretion." United States v. Guerrero-Cortez, 110 F.3d 647, 652 (8th Cir. 1997). On appeal, Jewell additionally contends the introduction of the deposition violated his right to a fair trial, his right to remain silent, and amounted to prosecutorial misconduct in violation of his due process rights. Because these additional claims were not raised in the district court, we review them for plain error only. United States v. Lomeli, 596 F.3d 496, 504 (8th Cir. 2010). "Under the plain error standard, we will reverse the district court only if the error prejudices the substantial rights of the defendant, and would result in a miscarriage of justice." United States v. Jones, 266 F.3d 804, 814 (8th Cir. 2001).

The government's introduction of the Piedmont videotape was not relevant to the tax evasion charge; instead, the videotape related only to the mail fraud conspiracy charge. During the deposition, Piedmont's attorney repeatedly asked Jewell for the names of the clients whose money was used to invest in Scanning Technologies, and Jewell repeatedly asserted the attorney-client privilege as the reason for refusing to answer the question. The government introduced the videotape to attempt to prove Jewell was inappropriately asserting the attorney-client privilege to avoid disclosing his use of client trust account funds without his clients' knowledge.

As noted above, the jury acquitted Jewell of the mail fraud conspiracy charge to which the videotape deposition related. In United States v. Apodaca, 666 F.2d 89 (5th Cir. 1982), the Fifth Circuit addressed a similar situation in which a defendant alleged evidentiary error relating to the introduction of an exhibit relevant to acquitted conduct. In Apodaca, the defendant was charged with both corporate income tax evasion and personal income tax fraud. The jury convicted him of corporate income tax evasion, but returned verdicts of not guilty on the three counts of personal income tax fraud. Id. at 91. On appeal, he challenged the introduction of Exhibit 121, a summary of his personal expenses. The Fifth Circuit found no error in the introduction of the exhibit, stating "the defendant was acquitted on all charges related to his personal income tax returns, and . . . we are convinced that there was no reasonable possibility that any error in admitting Exhibit 121 contributed to Apodaca's conviction [for corporate tax evasion]." Id. at 95-96.

Similarly, we fail to see how any alleged error in admitting the videotape deposition contributed to Jewell's conviction for aiding and abetting tax evasion. The videotape related only to the government's failed attempt to secure a conviction for conspiracy to commit mail fraud, and the jury was instructed to consider each charge separately. Cf. United States v. Lawson, 173 F.3d 666, 671 (8th Cir. 1999) (concluding the defendant was not prejudiced by joinder of separate counts where the "district court also specifically instructed the jury to consider each count and the

relating evidence separately" and "[n]othing in the record suggests that the jury could not keep separate the relevant evidence to each count").  We conclude the district court did not abuse its discretion  in admitting the videotape under Rule 403's balancing test.  In addition, we conclude the admission of the videotape did not prejudice Jewell's substantial rights.

B

Jewell next claims the district court should have granted his request to strike the testimony of witness Scott Fletcher.  We review a district court's decision to admit or exclude testimony for an abuse of discretion.  Quigley v. Winter, 598 F.3d 938, 946 (8th Cir. 2010).

Fletcher was an attorney who practiced law with Jewell and Moser. He also oversaw the firm's computer system.  Fletcher testified regarding several documents Jewell generated as part of the fictitious venture capital agreement, including the dates the documents were created.  Fletcher also gave his opinion that Jewell had forged the signature of a man named Robert Standard on some documents,[3] and also testified that Jewell admitted to forging Standard's signature on one occasion.  Finally, Fletcher testified regarding a conversation he had with Jewell after Fletcher met with government agents from Michigan who were investigating Moser.  Fletcher said he encouraged Jewell to speak to the agents as well, and Jewell said he could not because of what he had done with three clients, one of whom was Evans.  The government introduced this last conversation to show guilty knowledge on Jewell's part regarding the tax advice he gave the Evanses.

---

[3]Without Standard's knowledge, Jewell identified Standard as the administrator for the MIN Enterprises retirement account in which he placed some of the copyright infringement settlement funds. Fletcher was familiar with Standard's handwriting and signature because the two were best friends.

-6-

Prior to trial, the government had given Fletcher informal limited immunity pursuant to a proffer letter.[4] When defense counsel cross-examined Fletcher about certain conduct, he invoked his Fifth Amendment right because the proffer letter did not give him immunity from prosecution for conduct to which he might admit. Upon Fletcher's first invocation of the Fifth Amendment, the district court excused the jury and directed defense counsel to ask Fletcher all questions he intended to ask him that might invoke the Fifth Amendment, to determine whether it would be appropriate to allow the questions in front of the jury. After that occurred, defense counsel wanted Fletcher to invoke his Fifth Amendment rights in the presence of the jury, and the district court allowed that to happen, while at the same time giving the jury an explanatory instruction.[5]

During Fletcher's redirect examination, defense counsel asked the district court to strike all of Fletcher's testimony. He argued Fletcher's invocation of the Fifth Amendment would lead the jury to infer Jewell was guilty because the questions posed to Fletcher pertained in part to Jewell's same alleged wrongful conduct. Defense counsel also contended Fletcher's invocation of the Fifth Amendment unduly

---

[4]Fletcher's proffer letter provided that statements Fletcher made in a series of meetings with the government could not be used against him in a subsequent proceeding. The letter did not, however, provide Fletcher with formal statutory immunity under 18 U.S.C. § 6002.

[5]The district court instructed the jury as follows:

Ladies and gentleman, the Fifth Amendment to the Constitution of the United States provides a privilege against self-incrimination. A person is entitled to invoke that privilege under certain circumstances if that person has some concern that there might be a prosecution. The invocation of the privilege against self-incrimination is not a confession, it's not an admission of guilt, and should not be treated by you as such.

Trial Tr. at 997.

restricted his ability to cross-examine Fletcher on motive and bias. Finally, defense counsel asked the district court to strike Fletcher's testimony on the grounds Fletcher had volunteered non-responsive and prejudicial testimony during the cross-examination.

The district court refused to strike Fletcher's testimony. Instead, the district court referred to the cautionary instruction it had given to protect Jewell from any alleged guilt-by-association the jury may infer due to Fletcher's invocation of the Fifth Amendment. The district court specifically noted Fletcher's invocation of the Fifth Amendment was "done by agreement. And if that was the wrong way to do it, it was done by error, but it was done by agreement." Trial Tr. at 1064. With respect to the claim that Fletcher's testimony should be stricken because it was non-responsive and prejudicial, the district court had sustained counsel's objections to non-responsive answers at the time they were made, and instructed the jury to disregard the statements.

We need not decide whether the district court abused its discretion by refusing to strike Fletcher's testimony based on Fletcher's invocation of the Fifth Amendment in front of the jury, because Jewell is estopped from making that argument. Under the invited error doctrine, "[a]n erroneous ruling generally does not constitute reversible error when it is invited by the same party who seeks on appeal to have the ruling overturned." United States v. Wisecarver, 598 F.3d 982, 988 (8th Cir. 2010) (quoting Roth v. Homestake Mining Co., 74 F.3d 843, 845 (8th Cir. 1996)). "The doctrine of invited error applies when 'the trial court announces its intention to embark on a specific course of action and defense counsel specifically approves of that course of action.'" United States v. Mahler, 141 F.3d 811, 815 (8th Cir. 1998) (quoting United States v. Ahmad, 974 F.2d 1163, 1165 (9th Cir. 1992)). Here, the district court announced its intention to allow Jewell to have Fletcher invoke his Fifth Amendment right in the presence of the jury, followed by the court's cautionary instruction. Jewell agreed with that course of action. Having specifically requested that the district court

permit Fletcher to invoke his Fifth Amendment rights in the presence of the jury, Jewell may not now complain about Fletcher doing so.

In addition, we see no abuse of discretion in the district court's decision not to strike Fletcher's testimony based on Jewell's claim that some of Fletcher's cross-examination answers were non-responsive and allegedly prejudicial. Having examined the transcript, we conclude the district court's course of action – sustaining Jewell's objections and instructing the jury to disregard the non-responsive statements – adequately cured any claimed prejudice arising from the non-responsive statements.

C

Jewell contends the district court improperly limited his ability to cross-examine Bobby Keith Moser. We review evidentiary rulings regarding the scope of cross-examination for an abuse of discretion, except where the Sixth Amendment confrontation clause is implicated, and then our review is de novo. United States v. Ragland, 555 F.3d 706, 712 (8th Cir. 2009).

Moser was Jewell's law partner. He was charged with and convicted of three separate criminal schemes, one of which involved the same mail fraud conspiracy conduct for which Jewell was acquitted. At Jewell's trial, Moser testified for the government primarily with respect to the mail fraud conspiracy charge. As relevant to the tax evasion charge, Jewell claims his ability to cross-examine Moser was unfairly limited in three respects.

First, defense counsel wanted, but was not allowed, to admit into evidence Moser's plea agreement and some documents Moser gave to a grand jury in Michigan. The documents were promissory notes Moser had prepared in the law firm that were fraudulent. In the plea agreement, Moser admitted to having prepared the notes, but the footers on the bottom showed the initials of other attorneys in the firm. The

purported purpose of admitting the promissory notes and plea agreement was to show that sometimes Moser used other attorneys' initials on fraudulent documents he prepared. Jewell wanted to suggest the fraudulent documents used in the Evans tax scheme were prepared by Moser using Jewell's initials, rather than by Jewell.

Carl Evans testified regarding Jewell's specific involvement in the scheme regarding the fictitious venture capital agreement. He also testified that his knowledge of Moser was limited to having met him once in the law firm's lobby. Thus, there was no colorable factual basis for the theory that Moser, rather than Jewell, was responsible for the creation of the letter explaining the fictitious venture capital agreement. The district court did not err in limiting this line of cross-examination.

Next, defense counsel wanted to introduce the list of tax evasion crimes Moser acknowledged committing while in the firm. The Evans tax evasion crime was not on the list. Defense counsel claims he should have been allowed to admit the list to demonstrate the magnitude of Moser's criminal activity to attack his credibility, and to suggest to the jury that it was Moser, not Jewell, who handled the Evans transaction.

Defense counsel thoroughly attacked Moser's credibility on many levels, including his guilty pleas to numerous felonies (one of which was perjury), his lies to law enforcement, and his flight to Madagascar to avoid jail. The district court did not err in excluding the list from evidence, because admission of the list would only have been cumulative evidence attacking Moser's credibility. See Ragland, 555 F.3d at 712 (affirming a district court's limitations on cumulative cross-examination which "would have added only marginally to any impeachment of [a witness's] credibility"). In addition, as noted above, there was no colorable factual basis for Jewell's theory that Moser committed the Evans tax fraud scheme rather than Jewell, because Carl Evans testified it was Jewell, not Moser, with whom he consulted on the Press Promotions settlement and its tax consequences.

Finally, Jewell claims his cross of Moser was unfairly limited regarding a particular statement Moser made to law enforcement indicating the funds invested in Scanning Technologies were law firm fees rather than stolen client trust fund money. This statement pertains to the mail fraud conspiracy, and Jewell was acquitted of that conduct. Thus, the only relevance of this line of questioning as it pertains to the tax evasion charge would have been how the jury evaluated Moser's overall credibility. Because defense counsel was able to thoroughly attack Moser's credibility, the district court did not abuse its discretion or violate the Confrontation Clause by limiting cross on this issue.

D

Jewell also contends the district court erred when it failed to order the government to disclose the presentence report (PSR) and financial statement from Bobby Keith Moser's criminal case. Jewell argues he was entitled to Moser's PSR and financial statement in order to challenge Moser's credibility. We review a district court's decision to provide or deny a criminal defendant access to another person's PSR for an abuse of discretion. United States v. Spotted Elk, 548 F.3d 641, 672 (8th Cir. 2008).

In the district court, Jewell brought a motion to require the government to disclose Moser's PSR, or in the alternative, asking the district court to conduct an *in camera* review of the PSR to determine whether it contained material which should be disclosed. The district court denied the motion, relying in part upon United States v. Molina, 356 F.3d 269 (2d Cir. 2004), which held "no in camera review of a co-defendant's PSR is required without a threshold showing of a good faith belief that a co-defendant's PSR contains exculpatory evidence not available elsewhere." Id. at 275. Our circuit has expressed a similar threshold "showing of special need" a defendant must make to obtain another person's PSR. Spotted Elk, 548 F.3d at 672. In Spotted Elk, "the district court found that [the defendant] . . . could obtain the

-11-

necessary information about co-conspirators' offense characteristics, criminal history, and sentences from publicly available sources." Id. In affirming the district court, we found it was not an abuse of discretion to require a third party desiring information about a defendant's sentencing proceedings to attend the sentencing hearing, nor was it an abuse of discretion to require the third party to show that the publicly available sources of information were not adequate for his purposes. Id. Jewell did not make a showing of special need for Moser's PSR, and thus the district court did not abuse its discretion in refusing to disclose the PSR or financial statement (or in declining to conduct an *in camera* review of the documents).

E

Jewell claims the district court erred in admitting evidence we will refer to as the Christian Missionary Fund (CMF) evidence under Rule 404(b) of the Federal Rules of Evidence. We view Rule 404(b) as a rule of inclusion, United States v. Wiley, 29 F.3d 345, 350 (8th Cir. 1994), and thus recognize the district court's broad discretion in determining admissibility under the rule. United States v. Wagoner, 713 F.2d 1371, 1375 (8th Cir. 1983).

The district court allowed the government to introduce evidence of a separate tax evasion scheme in which Jewell participated to establish his intent to engage in the Evans tax evasion scheme. Moser created a nonprofit corporation called the Christian Missionary Fund (CMF), to which both he and Jewell made contributions, claiming the contributions were charitable for tax purposes. In reality, the payments made to CMF were tuition payments for the two men's children, who attended private schools. After the so-called charitable contributions were made to CMF, CMF would in turn award "scholarships" for donors' children at the schools they attended. The government argued this tax evasion scheme, which occurred during the same time Jewell engaged in the Evans tax evasion scheme, was admissible as evidence of Jewell's criminal intent to evade taxes.

Other acts evidence is admissible under Rule 404(b) if it is 1) relevant to a material issue raised at trial, 2) similar in kind and close in time to the crime charged, 3) supported by sufficient evidence to support a jury finding the defendant committed the other act, and 4) its probative value is not substantially outweighed by its prejudicial value.

United States v. Johnson, 439 F.3d 884, 887 (8th Cir. 2006).

The CMF evidence was relevant to Jewell's intent to engage in a tax evasion scheme, was arguably similar to the Evans tax evasion scheme, and occurred during the same time. Finally, there was sufficient evidence to show Jewell engaged in this separate tax scheme, and the district court was within its discretion to determine the probative value of the evidence was not outweighed by its prejudicial effect under Rule 403. We therefore find no abuse of discretion in the district court's decision to admit evidence of the CMF tax evasion scheme.

Relatedly, Jewell contends the district court's admission of the CMF evidence required the district court to grant his motion to sever the trial of the mail fraud conspiracy count from the trial of the tax evasion count, because the CMF evidence was only relevant to the tax evasion count. Jewell argues the CMF evidence improperly spilled over to the jury's consideration of the mail fraud conspiracy. A district court's denial of a severance motion will be reversed only if the denial resulted in severe or compelling prejudice. United States v. Boyd, 180 F.3d 967, 981 (8th Cir. 1999). Jewell cannot show he was prejudiced by any alleged spillover, because the jury acquitted him of the mail fraud conspiracy count. We therefore find no reversible error arising from the district court's denial of Jewell's motion to sever.

F

Jewell next argues the district court erred when it denied his motion for a judgment of acquittal on the tax evasion charge. We review this claim de novo.

-13-

United States v. Street, 531 F.3d 703, 710 (8th Cir. 2008). "When judgment of acquittal is sought on the basis of insufficiency of the evidence we view the evidence in the light most favorable to the verdict and give the government the benefit of all reasonable inferences that can logically be drawn from the evidence." Id. (citing United States v. James, 172 F.3d 588, 591 (8th Cir.1999)). "The standard of review is very strict, and we will reverse a conviction only if we conclude that no reasonable jury could have found the accused guilty beyond a reasonable doubt." United States v. Garcia, 521 F.3d 898, 901 (8th Cir. 2008) (quoting United States v. Beck, 496 F.3d 876, 879 (8th Cir. 2007)).

Jewell argues there was insufficient evidence for the jury to conclude there was a tax deficiency involving the Evanses and thus no evidence Jewell intended to aid or abet them in evading or defeating their taxes. We disagree. "The elements of tax evasion are willfulness, the existence of a tax deficiency, and an affirmative act constituting evasion or attempted evasion of the tax." United States v. Marston, 517 F.3d 996, 999 n.2 (8th Cir.2008). Evans testified at trial that Jewell concocted the venture capital agreement as a means of significantly reducing the amount of personal income tax reported by Carl and Patricia Evans in the tax year 2000. An IRS agent testified the difference between the tax liability the Evanses actually paid in 2000 and the amount they should have paid resulted in a tax deficiency of $737,436. This evidence was clearly sufficient for a reasonable jury to have found the government presented evidence to satisfy all three elements of aiding and abetting tax evasion. See, e.g., United States v. Abodeely, 801 F.2d 1020, 1023 (8th Cir. 1986) (generally outlining what the government has to prove to show a tax deficiency).

Jewell argues the evidence was insufficient because the IRS never made an assessment of the tax deficiency for the Evanses for the tax year 2000. He relies on a statement from United States v. Schoppert, 362 F.3d 451 (8th Cir. 2004), which says "the taxes evaded must have been imposed by the Internal Revenue Code and owed by the taxpayer." Id. at 456. Jewell wrongly equates a tax assessment with a tax

-14-

deficiency.  "A tax deficiency exists from the date a return is due to be filed; that deficiency arises by operation of law."  United States v. Voorhies, 658 F.2d 710, 714 (9th Cir. 1981).  Thus, there can be a tax deficiency without an assessment.  United States v. Bennett,  330 Fed. Appx. 686, 687 (9th Cir. 2009).

Jewell also claims he cannot be guilty of tax evasion because the Evanses eventually paid their taxes.  Jewell relies upon a case from the Ninth Circuit for the proposition a defendant must intend a permanent escape from paying a tax and not merely a postponement.  See Edwards v. United States, 375 F.2d 862, 867 (9th Cir. 1967) ("[E]vasion and defeat . . . contemplate an escape from tax and not merely a postponement of disclosure or payment.").  The Eighth Circuit has not adopted such a position, however, and the Ninth Circuit itself has limited Edwards to the unique facts involved in that case, where there was no evidence at all of an intent to avoid payment of taxes, but merely to delay.  See United States v. Huebner, 48 F.3d 376, 380 (9th Cir. 1994) (indicating the escape not postponement "statement in Edwards must be read in the light of the facts of that case.").  The fact that the Evanses eventually reconciled their tax deficiency with the IRS does not exonerate Jewell where a reasonable jury could determine he had the intent to assist the Evanses with evading taxes in the tax year 2000.[6]

_____

[6]Jewell also claims the evidence was insufficient because the admission of the Evanses' 2000 tax return violated Crawford v. Washington, 541 U.S. 36 (2004). Jewell contends a tax return is "testimonial" because it is signed by  taxpayers under penalty of perjury.  The government offered the tax returns prior to trial as business records, and Jewell did not object to them except as to relevancy, so we review this claim for plain error only.  We find no plain error.  Because Carl Evans testified, Jewell had an opportunity to challenge the accuracy of the tax returns.  In addition, in United States v. Garth, 540 F.3d 766 (8th Cir. 2008), abrogated on other grounds, United States v. Villareal-Amarillas, 562 F.3d 892 (8th Cir. 2009), we rejected the argument that admission of tax returns, even as to non-testifying witnesses, violated Crawford.  Id. at 778 (noting Crawford did not consider business records to be testimonial, and that the defendant stipulated the tax returns were business records).

-15-

G

Jewell contends the jury instruction on the elements of aiding and abetting tax evasion constructively amended the indictment from a charge of tax evasion (in violation of 26 U.S.C. § 7201) into a charge of filing a false tax return (in violation of 26 U.S.C. § 7206). "In reviewing an appeal based on a claim of constructive amendment, we consider whether . . . the jury instructions created a substantial likelihood that the defendant was convicted of an uncharged offense." United States v. Whirlwind Soldier, 499 F.3d 862, 870 (8th Cir. 2007) (internal quotation marks omitted).

Final Instruction No. 16 contained the elements of aiding and abetting tax evasion, which referred to the filing of a false tax return by the Evans as an act done willfully by Jewell to evade or defeat a tax. The instruction listed the second element of aiding and abetting tax evasion as follows: "Second, Barry Jewell voluntarily and intentionally caused to be prepared, signed, and filed a false and fraudulent income tax return for Carl Evans in an attempt to evade and defeat that additional tax." Jewell claims the reference to a false tax return constructively amended the tax evasion charge into a charge of filing a false tax return.

Jewell was charged with aiding and abetting tax evasion under 18 U.S.C. § 2. As Final Instruction No. 16 indicated, one way Jewell could aid and abet tax evasion was by causing the Evanses to file a false tax return in an attempt to evade or defeat taxes. Consequently, the jury instruction did not create a substantial likelihood that Jewell was convicted of an uncharged offense.

H

Next, Jewell contends the district court erred when it refused to order the disclosure of certain interview memoranda and notes prepared by IRS agent Dan

-16-

Elliott pursuant to the Jencks Act, 18 U.S.C. § 3500. We review the district court's ruling under the Jencks Act for clear error. United States v. Wright, 540 F.3d 833, 842 (8th Cir. 2008).

As relevant to the tax evasion charge, Elliott testified about the backdated documents Jewell created to carry out the tax evasion scheme. Elliott also discussed how he traced the $62,000 legal fee Evans paid Jewell for his services. After Elliott's direct examination, the district court ordered the government to provide the court with a list of all materials prepared by Elliott that had been disclosed pursuant to the Jencks Act, as well as a list of all materials that had been withheld as non-Jencks Act materials. Items on the second list included memoranda of witness interviews, one memorandum of activity regarding a topic Elliott did not discuss during his direct examination, and Elliott's handwritten notes of meetings with witnesses. The district court concluded Elliott "did not, on direct examination, testify about what any of these [witnesses] told him during the interviews. And so, I'm going to make this [list] a part of the record, but under the cases that I've looked at, I don't think that it's Jencks Act material. I think the Jencks Act material has been provided based on these two lists." Trial Tr. at 1285-86.

Jewell relies upon Palermo v. United States, 360 U.S. 343 (1959), and United States v. New, 491 F.3d 369 (8th Cir. 2007), to argue Elliott's undisclosed memoranda and field notes constitute statements under the Jencks Act. In Palermo, the Supreme Court stated a purpose of the Jencks Act was to prevent "the undiscriminating production of agent's summaries of interviews regardless of their character or completeness." Palermo, 360 U.S. at 350. To allow the defense to use statements to impeach a witness which could not fairly be said to be the witness's own statement rather than the product of the investigator's selections, interpretations and interpolations would be unfair. Once a witness has testified on direct examination, the Jencks Act requires the production of "statements" which are in the government's

-17-

possession "which relate to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b).

New is consistent with Palermo's application of the Jencks Act. New was prosecuted for involuntary manslaughter after he lost control of a vehicle he was driving while intoxicated, and his two passengers later died as a result of the crash. The Bureau of Indian Affairs agent, Agent Bennett, conducted his investigation of the incident and wrote a five-page case report "that sets forth actions that Bennett took on the date of the accident and observations that he made at the scene of the accident." New, 491 F.3d at 376. Bennett's report describing what *he* saw and what *he* did at the crime scene related to his testimony on direct examination and therefore should have been produced. See id.

Neither New nor Palermo compelled the government to hand over its entire case file of interviews and notes or other materials as Jencks Act material. In New, the entire contents of Bennett's case report constituted a "statement" which related to his own testimony on direct examination about a discrete traffic accident. In contrast, Elliott's notes and memoranda related to a number of witness interviews unrelated to his testimony. Because Elliott's testimony focused on selected aspects of his investigation, the government was only obligated to provide any "statement" made by Elliott which "relate[d] to the subject matter" to which he testified. See 18 U.S.C. § 3500(b), (e)(1), (e)(2), (e)(3); Wright, 540 F.3d at 842. Because the information on the government's list of non-Jencks Act material did not pertain to the subject matter of Elliott's testimony, the trial court did not clearly err in refusing to order the production of the material.[7]

_____

[7]Jewell also challenged the district court's exclusion of the testimony of several defenses witnesses, purportedly offered to show Agent Elliott's bias as well as the bias of the IRS auditors. This purported claim of bias was not developed on appeal, however, and we therefore deem the argument waived. See Cubillos v. Holder, 565 F.3d 1054, 1058 n.7 (8th Cir. 2009) (deeming an argument not developed on appeal to be waived).

## I

Jewell next argues the district court failed to conduct an *in camera* review of certain interview and field notes prepared by government agents to determine whether the material should have been disclosed pursuant to Brady v. Maryland, 373 U.S. 83 (1963). We review the district court's decision not to conduct an *in camera* review of alleged Brady material for an abuse of discretion. United States v. Price, 542 F.3d 617, 621 (8th Cir. 2008). Jewell's contention on this point fails because he did not present anything other than speculation that the documents he wanted the district court to inspect contained Brady material. See United States v. Pou, 953 F.2d 363, 366-67 (8th Cir. 1992) ("Mere speculation that a government file may contain Brady material is not sufficient to require a remand for in camera inspection, much less reversal for a new trial.") (citation omitted).

## J

Jewell contends the district court erred when it refused to allow witness Ralph Hamner to give an opinion about the truthfulness of another witness, Debra Duree, pursuant to Rule 608(a) of the Federal Rules of Evidence. We review the district court's decision to admit or exclude evidence under Rule 608(a) for an abuse of discretion. United States v. Azure, 801 F.2d 336, 341 (8th Cir. 1986).

Duree was Jewell's ex-wife. She testified she had a meeting with Jewell in the summer of 2002 when he admitted he might go to prison because of something he did in his law firm, and she may receive some checks from him in the mail. Shortly after the meeting, Duree said she received a check for almost $25,000 from Jewell with the words "child support" written on the memo line of the check. Jewell called Ralph Hamner, the attorney in Jewell's divorce, to ask him his opinion regarding Duree's truthfulness (more specifically, her character for untruthfulness) under Rule 608(a).

The government objected arguing Rule 608(a) only pertains to introduction of evidence concerning the defendant's truthfulness or untruthfulness. The district court sustained the objection.

Rule 608(a) states:

The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

Rule 608(a) applies to all witnesses, not just a defendant. See, e.g., United States v. Turning Bear, 357 F.3d 730, 734 (8th Cir. 2004). Jewell laid the proper foundation for Hamner's knowledge of Duree's character for truthfulness or untruthfulness. The district court therefore abused its discretion when it refused to allow Hamner to give his opinion.

Given the strength of the government's case against Jewell for aiding and abetting tax evasion, however, we conclude the error was harmless and does not warrant a reversal of the conviction. See United States v. Langley, 549 F.3d 726, 729 (8th Cir. 2008) (indicating improper evidentiary rulings require a conviction to be reversed only when they affect a defendant's substantial rights or have more than a slight effect on the verdict). Carl Evans testified about the fictitious venture capital scheme Jewell created to reduce the Evanses' tax liability in the year 2000, other government witnesses explained how Jewell created backdated and forged documents to carry out the scheme, and an IRS agent testified the scheme resulted in a tax deficiency of $737,436. After reviewing the record, we are confident the district court's refusal to allow Hamner to give an opinion about Duree's untruthfulness was

harmless because it "did not influence or had only a slight influence on the verdict." United States v. Carroll, 207 F.3d 465, 470 (8th Cir. 2000).

K

Jewell claims the district court erred in denying his request for certain jury instructions. We review the district court's refusal to give a defendant's proposed instructions for an abuse of discretion. United States v. Meads, 479 F.3d 598, 601 (8th Cir. 2007).

Jewell requested several instructions which the district court declined to give, namely, (1) a jury instruction augmenting the definition of "intent to evade and defeat a tax," (2) a jury instruction relating to the level of intent required under 26 U.S.C. § 7201, (3) an instruction concerning a taxpayer's right to decrease or avoid taxes, (4) a jury instruction on good faith, and (5) a jury instruction regarding the testimony of witnesses who had committed perjury. Jewell's claim of instructional error fails because, even assuming Jewell's requested instructions were accurate statements of the law (a point disputed by the government), the jury instructions given by the district court correctly and adequately stated the applicable law. See United States v. Anderson, 533 F.3d 623, 632 (8th Cir. 2008) (indicating a defendant is not entitled to a particularly worded instruction as long as the instructions as a whole correctly state the law).

L

Jewell next argues certain remarks during the prosecutor's closing arguments were improper and so prejudicial they deprived him of his right to a fair trial. Significantly, Jewell made no contemporaneous objections to the remarks to allow the district court to take curative action it might have deemed appropriate. As a result, our

-21-

review is limited to plain error review.  United States v. Aleman, 548 F.3d 1158, 1167 (8th Cir. 2008).

During the closing argument, the prosecutor suggested the jury could infer Jewell's consciousness of guilt from the fact that Jewell's defense attorney contacted Carl Evans about the 2000 tax return over a year before any law enforcement officers contacted Evans.  The prosecutor's complete remark was as follows:

> You heard Mr. Evans testify, I asked Mr. Evans, When is the first time you thought there was a problem, any problem at all with the tax planning Mr. Jewell did for you? And he said, Well, I got a call from [the defense attorney].  And how far before any contact with law enforcement was that?  It was over a year. Over a year before any investigator, any law enforcement officer calls Carl Evans because there might be a problem, [the defense attorney] contacts Carl Evans.

Trial Tr. at 1941.  Jewell argues the prosecutor improperly suggested Jewell conspired with his attorney to influence Evans's cooperation with authorities.  We disagree.  The prosecutor never suggested defense counsel did anything improper by contacting Evans.  Nor did the prosecutor ever suggest Jewell and his attorney conspired to influence Evans's testimony.  The prosecutor's comment did not prejudice Jewell's right to a fair trial.

Jewell further contends the prosecutor made several allegedly disparaging comments about defense counsel during rebuttal that were so prejudicial Jewell's conviction must be overturned.  At one point, the prosecutor said "I heard [defense counsel] talking out of both sides of his mouth."  Trial Tr. at 2022.  This comment referred to the fact that Jewell presented two alternative theories of defense to the mail fraud conspiracy charge – the first theory was that all the client trust account funds invested in Scanning Technologies were legitimate; the alternative theory was that if the investments were not legitimate, Moser was the person responsible for the

wrongdoing, not Jewell.  At another point, in referring to the first of those alternative theories of defense (i.e., the investments were legitimate), the prosecutor said "[s]ome people call it the classic smoke and mirrors defense[.]"  Id. at 2023.  The prosecutor made two other "smoke and mirror" comments, both in reference to aspects of the mail fraud conspiracy charge rather than the tax evasion charge. Id. at 2023, 2026.  Finally, at one point, the prosecutor said:

> Now, I submit that [defense counsel] misstated one piece of evidence. And you are the triers of fact.  You decide at the end of the day what is the reality and what are the facts, absolutely.  So if anything I say is not consistent with your memory, your memory goes.  But let me just suggest to you that perhaps you were misled on a few issues.

Id. at 2023-24.  The prosecutor then discussed three of defense counsel's arguments, all of which related to the charge for mail fraud conspiracy rather than the tax evasion charge, and expressed her disagreement with defense counsel's view of the evidence. Id. at 2024-26.

Jewell argues these remarks are "nearly identical" to an argument held improper in United States v. Holmes, 413 F.3d 770 (8th Cir. 2005).  The remarks in Holmes were summarized as follows:

> "Mr. Moss is a good defense attorney, tries to get you to focus your attention over here when what really is important is right in front of you. It's all smoke and mirrors." (Mr. Moss was Mr. Holmes's trial counsel.) The district court overruled Mr. Holmes's objection that this comment was "improper."  The government continued to make similar comments about Mr. Moss later in its rebuttal argument, stating that "Mr. Moss wants to distract you and tell you about all this other evidence that's not important," and that issues that Mr. Moss had raised about who had owned the gun in question were a "red herring."  The government also commented that "Mr. Moss needs to make sure that they get their stories straight" ("they" presumably referred to Mr. Moss and Mr. Holmes), and

-23-

that the jury should "look at Mr. Moss's story. That's why I said he's got to get his stories straight."

Id. at 775. The court found the argument improper because the "various comments referring personally to Mr. Moss and the necessity for Mr. Moss to 'get his stories straight,' taken as a whole and in the context of the rebuttal argument, show that the government attorney was accusing defense counsel of conspiring with the defendant to fabricate testimony." Id.

We disagree the comments in this case were similar to those found prejudicial in Holmes. First, there is no indication the prosecutor was accusing defense counsel of conspiring with Jewell to fabricate testimony. Here the "smoke and mirror" comments referred to the prosecutor's view of the strength of the theory of defense, and did not suggest fabrication of testimony. Similarly, the comments about misstating evidence and the jury being misled did not accuse defense counsel of fabricating evidence, but rather expressed the prosecutor's disagreement with defense counsel's view of certain items of evidence. It is not improper for the government to comment on its interpretation of the evidence. United States v. Woods, 696 F.2d 566, 571 (8th Cir. 1982). In addition, the prosecutor contemporaneously reminded the jurors "[y]ou decide at the end of the day what is the reality and what are the facts, absolutely. So if anything I say is not consistent with your memory, your memory goes." Second, the prosecutor's allegedly prejudicial comments all related to the mail fraud conspiracy charge. We fail to see how comments relating solely to the mail fraud evidence, even if improper, caused Jewell any prejudice when the jury acquitted him of that conduct.

In addition, our review in Holmes was not limited to plain error review because the improper comments were objected to at trial, and the Holmes court found the prosecutor's remarks warranted a reversal only after determining the jury's verdict could have been affected by "the exclusion of admissible testimony and the relative

weakness of the government's case[.]" <u>Holmes</u>, 413 F.3d at 775. Here, the government's case against Jewell was relatively strong, and we have not identified any improperly excluded testimony that may have affected the jury's verdict. Reviewing for plain error, we do not find any basis for reversing Jewell's conviction due to the prosecutor's closing arguments.

M

Jewell next contends the cumulative effect of trial errors denied him a fair trial. We will not overturn a conviction based upon the cumulative effect of trial errors unless there is substantial prejudice to the defendant. <u>United States v. Anwar</u>, 428 F.3d 1102, 1115 (8th Cir. 2005); <u>see also</u> <u>United States v. Steffen</u>, 641 F.2d 591,598 (8th Cir. 1981). Jewell, however, has not shown any prejudice resulted from trial errors, let alone substantial prejudice. The only trial error we have identified was the district court's failure to allow witness Hamner to give an opinion regarding witness Duree's character for untruthfulness, and we held the error was harmless because our review of the record as a whole indicated it did not affect the jury's verdict. Thus, there is no basis for overturning Jewell's conviction due to the cumulative effect of trial errors.

N

Finally, Jewell contends the district court erred when it denied his motion for a new trial. We review the denial of a motion for a new trial for an abuse of discretion. <u>United States v. Dittrich</u>, 204 F.3d 819, 821 (8th Cir. 2000).

Jewell's new trial motion rested on two grounds. First, Jewell claimed the government committed a <u>Brady</u> violation by failing to disclose exculpatory evidence. The allegedly exculpatory evidence was a government interview with Dr. Edwin Bird, a client of both Jewell's and Moser's, who along with both men participated in the

CMF fund (whereby participants paid for their children's private tuition under the guise of scholarships and claimed tax deductions for charitable contributions). In support of the new trial motion, Bird submitted an affidavit about a phone conversation he had with "an individual claiming to be an FBI agent" sometime in 2008. During the phone call, Bird was asked "whether my involvement with the fund involved Keith Moser or Barry Jewell" and he stated the fund "was Moser's deal and not Jewell's." Jewell contends this evidence was exculpatory as to the government's claim Jewell had the intent to evade taxes.

Second, Jewell argued he was entitled to a new trial because of newly discovered evidence. After the verdict against Jewell, a former client of Fletcher's came forward with a tape-recorded conversation he had with Fletcher on October 27, 2006, which shows Fletcher had animosity towards Jewell. Jewell claimed this new evidence of Fletcher's animosity probably would result in an acquittal upon retrial. See, e.g., United States v. Baker, 479 F.3d 574, 577 (8th Cir. 2007) (setting forth the four factors a defendant must prove in order to receive a new trial based on newly discovered evidence, which includes showing the new evidence probably will result in an acquittal upon retrial).

We conclude the district court did not abuse its discretion in denying the motion for a new trial. With respect to the alleged Brady violation, the government's CMF evidence showed Jewell, like Bird, participated in the CMF fund, and thus evidence suggesting the fund "was Moser's deal and not Jewell's" (i.e., that Moser incorporated and controlled CMF) would not have negated the government's claim that Jewell participated in the fund. The district court observed that disclosure of Bird's statement would not have changed the outcome of the trial, and we agree. See United States v. Parker, 267 F.3d 839, 846 (8th Cir. 2001) (setting forth the factors a defendant must establish to prove a Brady violation, which includes showing "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"). With respect to the new evidence of Fletcher's

animosity, we agree with the district court's observation that such evidence would only confirm what was already proven at trial, i.e., that Fletcher had animosity towards Jewell, but would add nothing new.  See Baker, 479 F.3d at 579 (generally indicating newly discovered evidence offered merely to impeach a witness's testimony is insufficient to warrant a new trial); United States v. Johnson, 450 F.3d 366, 373 (8th Cir. 2006) (same).

## III

We affirm the judgment of conviction.

_____